Please call the next case. Please approach the podium. Tell us who you are, who you represent, and how much time you think you need. Barry Shafitz, I represent the plaintiff appellant. Fifteen minutes total. Good morning, Your Honors. Karen DeGrand for the defendants' appellees. Ten to fifteen minutes. Okay, thank you. I assume we have read the briefs. We've looked at the files. And stick to your strongest points. Thank you, Your Honor. May it please the Court, counsel, essentially this is a straightforward factual case, one real factual issue to be resolved. The parties, all the parties, both parties agreed to what the standard of care was in this case. Standard of care required that the patient be followed up, that there be an evaluation, there be a biopsy, which would reflect a tumor. The records are practically very small. There's not much there. 525.00 is the first office visit with the partner of the defendant. 525.00, there's a telephone call, and that evening it's decided that the plaintiff will get a CT scan to see the defendant afterward. On 531.00, there's an office visit where the plaintiff is given samples of an anti-inflammatory and an antibiotic. On 65.00, there's an indication that the defendant reviewed a CT scan. There was a plan to see the plaintiff. What was the evidence? There was the office visit when he got the antibiotic? Well, there's no question there was an office visit. There's a note on May 31st, and Susan Cornis, who's the office manager, indicates that when she writes in the nasocort, she did not write the Avalox, that was the doctor. When she writes the nasocort, that means the patient was there in the office. And the other important point on that is there were three offices that the defendants had. The records, the charge, was contained in an office different than this office. And the procedure is that if the patient has a set appointment, that the records are brought over from that other office the night before so that they're present when the patient comes. Here she wrote on the chart that day, meaning that the record had been brought over that day, which is an inference that there was an appointment that day. Excuse me, counsel, I want to take you back. When you file this complaint for medical negligence against the defendants, isn't – this court is having a hard time getting around the fact that right from the beginning, you are making allegations. Your case begins with something that should actually cause a waiver of the Dead Man's Act anyway, shouldn't it? This court has a hard time understanding how you can bring allegations and be able to put on a case without opening the door to conversations, the appearance, everything of the person who's the deceased. That's the point. That's the direct point of this case, Your Honor. That was the defendant's position, and that was the trial court's determination in its ruling. What the court is saying, if we accept what the court says, that at every negligence case, in every case involving negligence, you're going to have to put on evidence that the Dead Man's Act does not apply. Well, not every case has negligence. You're talking about a wrongful death medical negligence case, particularly where you're dealing with the records of the interaction between the client, and in this case, a doctor decedent and the defendant. If the court wants to restrict it to just medical negligence cases, then what the court is saying is in every medical negligence case, the Dead Man's Act does not apply. And I have not found any case that will say that. If that's what the court's position is, if what Your Honor is saying is the position of the court, I have nothing to rebut that because what the court is saying is any time you bring a cause of action, you make an allegation of medical negligence, you automatically, there is no Dead Man's Act, that subsection A, the exception of the subsection A applies, and you can't have any, and the Dead Man's Act does not apply. I have not found a case, no case has been cited that I know of that says that. With all due respect, counsel, what this court is saying is just asking how do you put on a case. On the one side, you want to be able to put on a case that talks about the problems that the defendant and the missteps the defendant made as to the decedent, but you don't want the decedent, the congressman, want anything touched. And that's, I'm just wondering, how do you put on a case like that? Aren't you also, both sides are hampered. No, because in this case, the purpose of the Dead Man's Act, the court said, is fairness, a level playing field, because there's one side that's not available. That's the purpose of the Dead Man's Act. Here we had, both sides had the same situation. We did not call, the plaintiff did not call the defendant as an adverse witness. There's no testimony in that. What the defendant is saying is, well, you called an expert witness, as the defendant did. And the expert witness looked at the records, and there was circumstantial evidence on both sides. The defendant's expert testified the same way as the plaintiff's expert, just the opposite. The defendant's expert based his opinion. Both experts agreed it's the standard of care. The plaintiff's expert on direct exam said, well, if Dr. Agins did not go and see Dr. Schoenberg, then there's no deviation from the standard of care. If he did, there was a deviation. That's the same testimony as Dr. DeLaCotta, the defendant's expert. What you had with Dr. DeLaCotta is the court allowed Dr. Schoenberg to testify that it was his custom and practice, if he saw a patient in the office, he'd make a notation. And the record did not have a notation of him seeing the patient in the office. So Dr. DeLaCotta could say, that's one of the basis of my finding, that he did not see it. The other basis was the medical history that was provided to Dr. Toriumi, who the patient had seen in September. And Dr. DeLaCotta said there's no medical history of the patient seeing Dr. Schoenberg. The plaintiff's expert had the exact same type of testimony. Dr. Crone, the plaintiff's expert, testified looking at the records, well, there is a medical history that the patient gave to Dr. Costantino, who did the surgery. And there is testimony that Mrs. Egan's indicated three or four occasions she saw Dr. Egan's home cauterized. First time certainly was from Dr. Wolfe, we know that. So that's two or three occasions she saw the patient cauterized. The same testimony from Everside. What the, everybody, you know, the defendant was crying that we don't have the opportunity to rebut this testimony. They rebutted it the same way the plaintiff did. They introduced the same testimony as the plaintiff did. The point is there was no direct testimony. It was all circumstantial. So you're saying as long as you have expert versus expert, plaintiff expert versus defendant expert, they can testify to the same thing without getting the part involved. And not only that. The defendant had the opportunity to correct all this. The plaintiff gave a discovery deposition where the plaintiff testified there was an office visit. It was the defendant who refused to allow the discovery deposition into evidence. Had that discovery deposition been allowed, then the defendant had every right to get up there and say, no, we did not have this office visit together. So the defendant is the one that creates the problem. Tactically, I'm not suggesting there's anything wrong in what they do. That's a tactical decision on their part. But they create the problem. The evidence is the same on both sides. And I think the difference, a lot of the difference between the cases cited by the defendants is when you have a witness. Most of the time, it's the defendant himself. There's an adverse witness called, and that opens the door when you're cross-examining. We didn't do it in this time. Why? For the same reason, the Dead Man's Act. That was our tactical reason for the Dead Man's Act. We were not going to open the Dead Man's Act. And I don't think we did. And I think that decision, and again, I say what the court is telling me. If the court believes that any allegation of negligence, medical negligence, opens the Dead Man's Act just by filing the complaint, then I agree. I have nothing to say. Your decision will be easy. Isn't practically speaking, the Dead Man's Act is not an act that comes up as a matter of course in a lot of these cases? I mean, this is just a question from the court. In medical negligence cases, as Your Honor indicated, at least the cases that I've seen, especially when you have a wrongful death medical negligence case, as Your Honor said, it will come up. But the way it's opened is essentially, the way it's opened is that a plaintiff will call a defendant, and there's records. The defendant prepared notes. And then when you interpret those records, and there are cases that say when there are records, the defendant has a right to interpret his own records. That's another distinction in this case. That's why we're not having an appeal with Dr. Wolf. Dr. Wolf prepared that first note and then an addendum. He has every right, and we called him as a witness, he has every right to interpret those notes. We have no quarrel with that. He has every right. But isn't that happening with Dr. Schoenberg? Isn't that happening with his records? What records? Well, in a way, I mean, by say, by omission. It wasn't contained in there. The only one who's saying that is the defendant's getting that benefit. The defendant is saying, because they're allowed to get into evidence, it is my custom and practice. And if I see the patient, I make a note. And the fact that I didn't make a note means I didn't see the patient. That's in evidence. We didn't object to that. Or if we did object, I forget who was overruled. That was in evidence. We're not appealing that issue, because I think that's appropriate. But that doesn't open the door for Dr. Schoenberg. This was a close case, if you look at the evidence. One side facing the Senate, the same evidence. The under the care is the same. This is a close case. And when the Court let Dr. Schoenberg get up there and say, oh, I never saw Dr. Agins. He never came for a follow-up here. That's the tipping point. I think the May 31st note is our second issue. I think that's very similar. The hearsay is our third, allowing Mrs. Agins to testify. The reason went to Dr. Toriomi. I think all those reasons. But I think the main one, the main issue that this case is really based on, the sole issue is did Dr. Agins see Dr. Schoenberg for a follow-up? If it's yes, we win. If it's no, we lose. It's a perfectly legitimate jury question. But when you have that evidence ---- Counsel, excuse me. I want to take you back to your statement that you all, the plaintiff, tried very hard and was very, very careful not to try to open the door. Wasn't there, was it Nurse Sanders, where the testimony over the defendant's objection was let in, where the decedent talked about his intention to see? The testimony from the nurse was that the decedent talked about the intention to see Dr. Schoenberg? He had an appointment, and she was cross-examined by the defendant. She couldn't remember what date that appointment was. This was plaintiff asking the nurse over the defendant's objection to this question. You're saying that's on cross? That didn't open anything. She testified that she had his calendar, and she testified that he had an appointment for a specific date. But on cross-examination of the defendant, the defendant cross-examined her, it was clear that she did not know ---- did a good job of cross-examining her. She did not know what date it was. It could have been that first office visit with Dr. Wolf on May 25th. So I don't see that. And again, I say if there's one case that says that just by alleging negligence we're out, as far as the Dead Man's Act is concerned, I'll stand corrected and I'll apologize to the Court. But I don't think ---- I haven't been able to find that case. The defendant hasn't found that case. And I think without that case here, I think Dr. Schoenberg's testimony should have been barred, that particular portion under the Dead Man's Act. If there's any other questions. Thank you, counsel. Thank you. Thank you. Good morning, Your Honors. Again, Karen DeGrand for the defendants. May it please the Court, I have ---- want to respond to the specific points that counsel brought up, but I'd like to make the context of the Court's consideration clear because this is a point that was brought up, not mentioned today, in the reply that he believes that this Court should review this matter under De Novo standard of review. And it's clear that the abuse of discretion standard of review applies to all of these evidentiary rulings that were made by the trial court. The exact argument that plaintiffs made in that regard is rejected by this Court in Beard v. Barron. The Dead Man's Act issues in this case turned on the nature of the evidence that was presented regarding the events and conversations involving Dr. Agins and Dr. Schoenberg. I think that the hearing on the post-trial motion perhaps has a very nice summary, both by the Court and by counsel, of what transpired. And I think one of the analogies that was used was that the trial judge had to make a lot of calls on all of the balls and strikes. There were numerous conversations and there was numerous testimony, that is, that was introduced by the plaintiff that the Court had to decide within her discretion whether that specific testimony opened the door. And it seems to me that the record quite clearly shows that the Court did not make a determination based solely on the complaint, although the complaint certainly raises the issue, as counsel had during his argument today, which is was Dr. Agins seen by Dr. Schoenberg during the summer of 2000 or was he not? And I think that that makes it pretty clear, and the Court knew that it was going to be pretty clear when she was considering the motions in Limine as to whether the door was going to be opened. But it's certainly not an accurate representation of the record to state that the judge made a determination that because this is a negligence case, the Dead Man's Act is gone. I mean, that's just not borne out by this record at all. And I think that Judge McWilliams heard and reheard these issues as the case went along, and I think she was quite careful and certainly within her discretion. The plaintiff opened the door for the first time in the opening statement when he framed the issues, as he did today. Did Dr. Agins go to see Dr. Schoenberg or not? And I think that was the preview of the evidence that was presented to the jury. And you're saying that that statement, an opening statement, opens the door? That was the beginning of it, Your Honor. That's certainly not the only opening of the door. And then it begins with Robin Sanders' testimony in the plaintiff's case. And it wasn't just testimony that involved whether there was an appointment made and so on and so forth, and it wasn't just on cross-examination. It was testimony that was introduced by the plaintiff that Dr. Agins, and this came in over the defendant's objection, Dr. Agins had said to his nurse, I need to be seen by Dr. Wolf, Dr. Schoenberg for these nosebleeds. And this was mentioned to her on more than one occasion. And those two or three conversations regarding Dr. Agins needing to be seen for his nosebleed came in, and the jury heard that. What about the plaintiff's position that that's fine if the nurse, you have witnesses on that side who can testify? There are other witnesses, not the defendant himself, who can testify to rebut the testimony of Dr. Agins. What about that? Well, the point, you know, the plaintiff doesn't get to pick and choose the evidence that the defendant introduces on this issue. And there's no case that says the defendant has to be brought in as an adverse witness for the door to be open. There's no case at all that says, in fact, in Holm v. Zia and in Malinowski, in both cases, it was the expert testimony that opened the door. And there's no, I read those cases again very carefully, and there's nothing in that case that suggests it was the defendant coming in on adverse, and that happens in some cases, but that wasn't the case here. There's also testimony by Susan Agins that on three or four occasions her husband said he was going to see Dr. Wolfe, Dr. Schoenberg, for nosebleeds, to treat the nosebleeds during the summer of 2000. That was specific evidence that came in that was relied on by the plaintiff's expert, Dr. Krohn. Dr. Krohn, his testimony, I think, makes it utterly clear that this case comes within Holm, Haste, Malinowski, Beard, that the door was open. Not only did he opine that Dr. Schoenberg failed to do a proper evaluation and failed to do follow-up that was necessary, he specifically gave the statement three or four times during the summer of 2000. So certainly he's going far beyond the medical records. He's not just relying on the medical records or specific statements in the medical records. He was relying on the testimony of these witnesses that repeated hearsay statements of Dr. Agins, I'm going to see Dr. Schoenberg, I've got to do something about these nosebleeds. And the other, he also testified that, and this is Dr. Krohn again, that the May 31st note meant that Dr. Agins had been in the office. Susan Kornis did not testify that she was at the Evanston office and gave these medicines. I have to submit that that is not an accurate statement of her testimony. She did not testify that she gave this medication to Dr. Agins. She testified that she was told to make this notation in the record. She didn't say where she was when she made that notation. She could have been in the Glenview office. The plaintiff never raised that issue. So I think in fairness, that testimony has to be scrutinized a little more closely to see what actually was said. And it wasn't, I have to say, as submitted here today. The other specific testimony that I think is really crucial by Dr. Krohn is that not only did he offer the criticism that there was not a proper evaluation based on these appointments that he says occurred, open the door, he also said that there was a deviation from the standard of care for not following up. So I would submit that if you stop, you're the trial judge, you look at this after Dr. Krohn's testimony, and it seems to me that the door is open, and you would be, I think that the trial court would have been well within their discretion to let in everything. But to testify to the lack of interaction, there weren't these appointments, here's what I did to follow up. We had two or three meetings at the hospital where I said, hey, when are you going to come in and be evaluated? I'm busy, I know I'm going to get there. Call any time, you can come in. That testimony all was barred. Judge McWilliams was very restrictive. And that's sort of the interesting thing about this, and going back to the hearing and the post-trial motion, Judge McWilliams specifically recalled that she had kept Dr. Schoenberg on a very short leash. And I think that's important to note. She certainly did not say at any time, this is a medical negligence case, and we're talking about some treatment, and we're talking about some appointments, it all comes in. Not at all. In fact, her decision to bar Dr. Schoenberg, and there's an offer of proof on his testimony that he would have explained, here's how I followed up. I was asking this guy. I saw him, we're colleagues, we'd see him in the surgical suite. I asked him, please come in, when are you going to come in? I'm going to come in, I'm going to come in. And that was his method of following up. That offer of proof is in the record, volume 10, page 229 to 231. And that testimony did not come in. We were not allowed to rebut that, and we should have been, in my opinion. But the judge, in her discretion, made this determination that she was going to restrict the testimony. So, counsel, but you're also, you're referring to the judges clearly differentiating between Dr. Krohn's testimonies, going a step further and so-called putting the gloss on his testimony, the gloss on his notes by making other assumptions and insinuations from the record. And that's why the defendant was allowed to testify in a limited manner. Is that your argument? It absolutely goes beyond, it goes beyond the gloss identified in Holm and testifies to events that are not referred to in the medical record. But on the other side, again, what about counsel's position that if you have a defense expert, they can get just as glossy and beyond as the plaintiff's expert? Well, if that is the case, then this Court would have to overrule Holm and would have to overrule the prior decision in Malinowski, because what the Court would be saying is that the testimony of a plaintiff's expert witness on a specific event does not open the door under the Dead Man's Act. And I don't think there's any basis for that whatsoever in the precedent of this Court or in fairness, which is what the ultimate goal of the Dead Man's Act is. Well, to get back to fairness, though, there was a discovery position here where the deceased testified he went to see the doctor several times. Yes. And he visited him in the office when he did that, right? And the decision was made tactically by the defense at trial to not stipulate that, even though the deceased had done the doctor, right? There was no such stipulation. That's correct, Your Honor. And there was colloquy that the Court may note in Volume 4 in one of the initial discussions of the Dead Man's Act between pages approximately 40 and 70 that refers to the deposition and the doctor's condition during that deposition and lack of lucidity. So there are some problems with taking that approach, certainly. They're perfectly within their rights. I'm just saying if we're going to get back to fairness, which we all do at the bottom line, you know, that is not what trial is all about, in my experience. In criminal it's supposed to be, but in civil fairness it has nothing to do with it. And are we the only state that doesn't use routinely discovery depositions as evidence depositions? I don't know if that's the case. I know we're different than Federal, for sure. I think we're alone. And I think we're also one of the few states, there's not very many states anymore that continues to have the Dead Man's Act on its book. It's been dropped in state after state, and we still have it, so it's still the law here. But it's fairly uniformly recognized that the protections that are offered by it generally are outweighed by the unfairness of its application. So that is what it is, but that's our law in this state. But I do think it's important to note that the precedent that this trial judge and, of course, this court was following absolutely supported her rulings, and frankly, I think we are well within our rights to argue very strenuously that we should have been able to bring in those other conversations, those other questions, and not only were we failing to evaluate at the office and failing to do a biopsy, but a further failure to follow up. But we weren't allowed to explain that. I think Malinowski home, very clear. I can't imagine that it would be fair to allow Dr. Crone to speculate as to a May 31 office visit that was clearly not documented. Let me say that a little bit better, that was not referred to in the medical records. When there's an office visit by a patient and this was undisputed, there's a stamp in the record. And the notation about giving some medication samples was made without any such stamp, and Susan Kornis did not testify, as I mentioned earlier, that the doctor was in the office on that date. But certainly once Dr. Crone came in and said that signified an office visit, that was an office visit, Dr. Schoenberg in fairness should have been allowed to testify and was allowed to testify that no such, there was no such office visit at that time. The point about Mrs. Agans not being allowed to testify to her husband's statement that Dr. Schoenberg has said there should be surgery and it should be postponed until after Thanksgiving. Frankly, I don't think that the legal theory here lines up with the testimony that the plaintiff was trying to introduce. The state of mind that it appeared to be offered for was Mrs. Agans' state of mind, but that wouldn't be applicable here. And to the extent that there's a somewhat cryptic reference to that testimony being applicable to allow statements of future action, well, the Thanksgiving comment had occurred in the past, so I don't see how that helps the plaintiff's case. And as far as the prejudice issue is concerned, Mrs. Agans clearly was allowed to express and to convey to the jury that she was fed up with the delays, that she was not happy with the treatment, did not think it was adequate, and there really was no reason other than for the proof to establish the truth of the matter asserted to get into the issue of let's delay until after Thanksgiving. If the Court has no further questions, I simply end by submitting that the plaintiff did not meet his burden of establishing any error, much less error, that impacted the verdict. And I thank the Court and ask for affirmance of the judgment that was entered into the case. Thank you. Thank you. In connection with Mrs. Cornish, and I guess the Court would have to review her testimony, it's my understanding of her testimony, she testified she would not have marked that notation about the anti-inflammatory unless the patient was in the office. And in any case, Dr. Schoenberg was allowed to testify concerning that issue because he had made the notation five days later, and in explaining that notation, he explained what happened on May 31st. So they rebutted it with Dr. Schoenberg. That's not part of this. The other points I want to make is Hone case and the other case dealt with an expert who was interpreting medical records. Big distinction between our case. Dr. DeLaCotta, their expert, said the same thing as Dr. Crone on the other side. He said it in his discovery, so we knew what he was going to say. He looked at the record and found instances that would justify his opinion that the patient did not see Dr. Schoenberg. He was making the same adjustments. Now, why was Mrs. Agin's testimony important regarding that visit with Dr. Toriomi? The defendant made it important because Dr. DeLaCotta said one of his reasons that the patient did not see Dr. Schoenberg was because there was nothing in the record, a medical history in the record of Dr. Toriomi. Dr. Toriomi testified and admitted that he did not have all, because he had changed institutions, and he did not have all his medical records with him. And I think certainly to rebut that, the testimony that the state of mind of Dr. Agin's in going to see the patient was because he was told not to have surgery until he didn't need surgery until after Thanksgiving, and Mrs. Agin's thought that was ridiculous. Counsel, isn't it still trying to present that testimony for the truth of the matter asserted? Well, you know, I understand the Court's reasoning, and that's why it became one of our minor issues. There is that element, but essentially the element that we're trying to do is rebut what Dr. DeLaCotta is saying. DeLaCotta is basing it on the fact that Toriomi did not have a history, given a history by Dr. Agin's that he went to see Schoenberg and whatever Schoenberg did, which Dr. Costantino did have the history. But Dr. Toriomi had also testified he didn't have all his records, because he left a lot of his records at his prior institution. So, but that's not the major, that's the reason why that testimony was there. But I think the major testimony is the Dead Man's Act. It's that first issue. It's regarding that, and I haven't heard anything. As far as de novo versus abuse, I don't think it makes much of a difference. But in this case, there is an interpretation and construction of the Dead Man's Act, subsection A. What will subsection A cover as far as waiving the Dead Man's Act? In the Beard case, it was entirely evidentiary issues that dealt with that. So I think this is a de novo case, because, again, as the defendants have argued, and they argue today, the allegation of negligence is enough to waive the Dead Man's Act. And I say it again, if the Court believes that, we're wrong. Well, isn't this different, though? So, I mean, they say at home, Beard, Malinowski, Theofanis, I'd suggest. But here, as you put, succinctly put the issue is, was he seen? I don't know how you get around it. I don't know how you can accuse a doctor of malpractice where he says, I never saw that guy, and the doctor can't testify he never saw that guy. That's odd. I don't know. How do you prevail? How is that fair? Well, it's fair because look what the doctor was able to get in this case. He was able to get in that it's his custom and practice, if he sees the patient, he would note it. And there's no notation there. That's one of the bases that Dr. DeLaCotta said. He did not see the patient. That was before the jury. They argued it in the final argument. That's all before the jury. The question is, on the Dead Man's Act, when the two people who can dispute this issue, was Dr. Egan's, was he seen by Dr. Schoenberg? Wasn't he seen by Dr. Schoenberg? No. One of those patients is not around. They had the Dead Man's Act apply unless there's an exception or there's a waiver of it. And here, I say again, it's the defendant themselves. They have a right to do it. They were the ones who refused to put in the discovery deposition. The plaintiff was willing to put in the discovery deposition for that point, for that point, in which case Dr. Schoenberg would have had every right to come in and rebut that. But he had that to cry now that how are we going to do it, as the defendant does and as the court suggests? Well, just the way they did it. They had, I wouldn't, the fact that there's no note in there indicates I didn't do it. Dr. DeLaCotta says I didn't do it. Just the way they did it. They were restricted in the same way that the plaintiff was restricted. They chose to go about doing it the same way that the plaintiff chose how to go about doing it. I mean, it was, the testimony was almost parallel, each one. It was not just one saying he was there, one saying he wasn't there. That's why I say, in my view, standard of care is not an issue. It was an easy factual issue. And they tipped the scale when they allowed him to testify that I didn't see him. That's all this case is about. Thank you. No questions? Okay. Thank you. The Court will take the case under review.